**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 22-1619**

———————

MARCO A. FERNANDEZ,

        Plaintiff – Appellee,

    v.

RENTGROW, INC.,

        Defendant – Appellant.

———————

Appeal from the United States District Court for the District of Maryland, at Baltimore.
James K. Bredar, Senior District Judge. (1:19-cv-01190-JKB)

———————

Argued: October 26, 2023               Decided: September 11, 2024

———————

Before NIEMEYER, QUATTLEBAUM, and RUSHING, Circuit Judges.

———————

Vacated and remanded by published opinion. Judge Rushing wrote the opinion, in which Judge Niemeyer and Judge Quattlebaum joined. Judge Niemeyer wrote a concurring opinion.

———————

**ARGUED:** Maura K. Monaghan, DEBEVOISE & PLIMPTON LLP, New York, New York, for Appellant. Matthew W.H. Wessler, GUPTA WESSLER PLLC, Washington, D.C., for Appellee. **ON BRIEF:** Kristin D. Kiehn, Emilia N. Brunello, DEBEVOISE & PLIMPTON LLP, New York, New York; Bonnie Keane DelGobbo, Chicago, Illinois, Joel Griswold, BAKER & HOSTETLER, LLP, Orlando, Florida, for Appellant. Neil K. Sawhney, GUPTA WESSLER PLLC, San Francisco, California; E. Michelle Drake, John G. Albanese, Ariana Kiener, BERGER MONTAGUE PC, Minneapolis, Minnesota; Martin

E. Wolf, GORDON, WOLF & CARNEY, CHTD., Towson, Maryland, for Appellee.

_____

RUSHING, Circuit Judge:

When Marco Fernandez applied to rent an apartment, defendant RentGrow, Inc., sent the property owner a tenant screening report about him. The report inaccurately stated that Fernandez had "1 Possible Match in OFAC Name Search." Luckily for Fernandez, the property manager who reviewed his report did not know what "OFAC" was or read the section of his report about the possible match, and it did not factor into any variable she considered when deciding whether to rent an apartment to him.

Nevertheless, Fernandez sued RentGrow for reporting this misleading information about him and sought to represent a class of similarly situated plaintiffs. The district court certified a class of individuals who were the subject of a consumer report with a misleading "possible OFAC match" furnished by RentGrow to a third party. In certifying the class, the district court rejected RentGrow's objection that Fernandez and the class members had failed to demonstrate a concrete injury sufficient to establish Article III standing to sue. According to the district court, it did not matter that the recipient of a misleading report did not read or comprehend it; dissemination of the report sufficed to show a concrete injury in fact.

We disagree. Reputational harm can be a concrete injury, but only if the misleading information was brought to the attention of a third party who understood its defamatory significance. The evidence here does not support an inference that any third party read and understood, or otherwise considered, the inaccurate OFAC information in Fernandez's tenant screening report. He therefore has failed to demonstrate a concrete injury sufficient

for Article III standing. That conclusion requires rethinking class certification, so we vacate the district court's certification order and remand for further proceedings.

I.

A.

In 2018, Fernandez returned from a deployment with the U.S. Navy and applied to rent an apartment in Maryland. The company that owned the apartment complex, Dorsey Ridge, relied on tenant screening reports created by RentGrow, a consumer reporting agency. Those reports compiled personal and financial information about each applicant, including their credit history, rental history, and criminal background. At the top of the first page, each report stated a screening result—such as accept, reject, or accept with conditions—based on the approval criteria provided to RentGrow by the property owner. The first page also identified the "Reasons for Result" and a bullet-point list of "Items to Review." J.A. 89. That list flagged potentially relevant records included later in the report. For example, it might include a bullet point stating that criminal records or rental records were found.

The "Items to Review" list would also state whether an individual was a "possible match" to a person on the United States Treasury Department's Office of Foreign Assets Control's (OFAC's) list of specially designated nationals who threaten America's national security. Individuals on the OFAC list are terrorists, drug traffickers, or other serious criminals, and it is generally unlawful for United States companies to transact business with them. *See* 31 C.F.R. pt. 501, App. A (2024). At the relevant time, RentGrow flagged an individual as a "possible match" if their first and last name matched, or were each within

4

one or two characters of, a name on OFAC's list.  Although RentGrow noted possible matches in its screening reports, that designation did not affect the screening result—i.e., accept, reject, or accept with conditions.

When Fernandez applied for an apartment, Dorsey Ridge requested and received a tenant screening report about him from RentGrow.  Fernandez's report recommended that Dorsey Ridge reject his application because his "criminal history does not meet property requirements."  J.A. 89 (capitalization omitted).  Among the "Items to Review," the report listed: "premium national criminal records found" and "1 possible match in OFAC name search."  J.A. 89 (capitalization omitted).  Later pages of the report detailed California criminal records supposedly connected to Fernandez, and the last section of the report identified the "possible" OFAC match: Mario Alberto Fernandez Santana of Zapopan, Mexico, who was born seven years before Fernandez and linked to a drug trafficking organization.  Dorsey Ridge denied Fernandez's application.  But two days later, after Fernandez explained that the criminal records did not belong to him, Dorsey Ridge approved his application.

## B.

Fernandez subsequently sued RentGrow for violating the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681 *et seq*.  His complaint asserted an individual claim based on RentGrow's criminal record reporting procedures, which is not at issue in this appeal.  Relevant here, Fernandez also brought an individual and class claim alleging that RentGrow willfully failed to "follow reasonable procedures to assure maximum possible accuracy" of OFAC information included in tenant screening reports.  15 U.S.C.

§ 1681e(b).  For this claim, the complaint sought statutory and punitive damages.  *See id.*
§ 1681n(a)(1)(A), (2).

During discovery, RentGrow deposed Porsche Kemp, the senior property manager
for Dorsey Ridge who reviewed tenant screening reports, including Fernandez's.  Kemp
explained that her standard business practice, and that of leasing agents under her
supervision, was to review only the screening result on the first page of the report if the
recommendation was "accept."  Only if the report recommended to reject or conditionally
accept a tenant's application would Kemp or an agent read more.  Kemp did not know if
she had ever looked at the section of a screening report about OFAC potential matches and,
when questioned about OFAC information, admitted she was not "sure what OFAC is."
J.A. 215.  She was not aware if the landlord had any policy about whether apartments could
be rented to people who appear on the OFAC list.  Regarding Fernadez in particular, Kemp
recalled that his application required further review because of criminal record information
in his screening report, not because of "OFAC possible match information."[1]  J.A. 214.

After discovery, RentGrow moved for summary judgment and Fernandez moved to
certify the class.  The district court decided both motions in a single opinion, denying
summary judgment and granting class certification.  As an initial matter, the court
addressed RentGrow's argument that Fernandez lacked standing to sue in light of the
Supreme Court's recent decision in *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021).

---

[1] The record contains no testimony from Suzanne Whatley, the leasing agent who
dealt most directly with Fernandez during his application process.  Fernandez testified that
Whatley did not mention the OFAC list possible name match to him.

The court concluded that Fernandez had demonstrated a concrete injury because his inaccurate OFAC alert was provided to a third party, which caused a reputational harm analogous to defamation. In the court's view, Fernandez did not need to show that anyone at Dorsey Ridge actually read and understood the OFAC alert to demonstrate a concrete injury; dissemination of the misleading report was enough. And even if such a showing were required, the court reasoned, because Dorsey Ridge paid RentGrow for the tenant screening report, a jury could conclude that Kemp "did in fact see the alert and simply forgot." *Fernandez v. RentGrow, Inc.*, 341 F.R.D. 174, 189 n.11 (D. Md. 2022). Further, the court concluded that all purported class members had standing because each one "had allegedly inaccurate information 'furnished' to a third party." *Id.* at 191.

The district court then denied RentGrow's motion for summary judgment on the merits of the FCRA claim and certified the following class:

> All individuals who were the subject of a consumer report (1) furnished by [RentGrow] to a third party between April 23, 2017 and May 24, 2019 at 7:28 a.m. and (2) which reported OFAC/SDN information indicating a possible match, and (3) where there is not also a match between the (a) date of birth, (b) address, or (c) social security number associated with the subject of the report and the corresponding information regarding the person on the OFAC/SDN List.

*Id.* at 214 (emphasis omitted). As the court ticked through each of the certification requirements in Federal Rule of Civil Procedure 23, it rejected RentGrow's counterarguments premised on the view that, to establish standing, each class member would have to prove that a leasing agent read and understood the OFAC alert in the class member's screening report. According to RentGrow, that inquiry undermined ascertainability, commonality, typicality, superiority, and predominance. *See* Fed. R. Civ.

P. 23(a), (b)(3).  Given its ruling rebuffing RentGrow's conception of concrete injury for Article III standing, the district court rejected RentGrow's objections to each requirement and certified the class.

C.

RentGrow petitioned this Court for permission to appeal the class certification order, which we granted.  *See* Fed. R. Civ. P. 23(f).  We have jurisdiction, 28 U.S.C. § 1292(e), and review the district court's decision to certify a class for abuse of discretion, *In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 233 (4th Cir. 2021).  "A district court per se abuses its discretion when it makes an error of law or clearly errs in its factual findings."  *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 317 (4th Cir. 2006).  Whether a plaintiff has Article III standing is an issue of law that we review de novo.  *South Carolina v. United States*, 912 F.3d 720, 726 (4th Cir. 2019).

II.

Article III of the United States Constitution empowers federal courts to decide "Cases" and "Controversies."  U.S. Const. Art. III, § 2.  Standing to sue is a doctrine rooted in the traditional understanding of this limitation on federal-court jurisdiction.  The "irreducible constitutional minimum of standing" requires a plaintiff to show (1) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (2) that the injury is fairly traceable to the challenged action of the defendant; and (3) that the injury would likely be redressed by judicial relief.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–561 (1992).  This case implicates the requirement of a concrete injury in fact.

Importantly, a plaintiff does not "automatically satisf[y] the injury-in-fact requirement" whenever a statute like the FCRA "grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *TransUnion*, 141 S. Ct. at 2205 (internal quotation marks omitted). "Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016). Accordingly, "[o]nly those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court." *TransUnion*, 141 S. Ct. at 2205.

The strictures of Article III standing apply with no less force in the context of class actions. Although "[e]very class member must have Article III standing in order to recover individual damages," *TransUnion*, 141 S. Ct. at 2208, we have analyzed standing in the early stages of a class action "based on the allegations of personal injury made by the named plaintiffs," *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 252 (4th Cir. 2020) (internal quotation marks omitted). A plaintiff must demonstrate standing "with the manner and degree of evidence" required at the relevant "stage[] of the litigation." *Lujan*, 504 U.S. at 561. Because RentGrow moved for summary judgment, Fernandez cannot rest on mere allegations but must set forth evidence which, viewed in his favor, would establish the elements of Article III standing. *See id.*; *Baehr*, 953 F.3d at 253. And "[s]tanding is not dispensed in gross"; therefore, regardless of Fernandez's standing to pursue his individual criminal records claim (which is not on appeal), he must also demonstrate that he suffered a concrete injury from RentGrow's alleged failure to employ reasonable

procedures to ensure the accuracy of the OFAC information in his report. *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (internal quotation marks omitted).

A.

To be concrete, an injury must be "real, and not abstract." *Spokeo*, 136 S. Ct. at 1548 (internal quotation marks omitted); *see id.* (explaining the injury "must actually exist"). Traditional tangible injuries, like physical harm and monetary harm, are the most obvious. But intangible injuries, although perhaps more difficult to recognize, can also be concrete. *Id.* at 1549. We evaluate whether an alleged injury is concrete by assessing whether it "has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 141 S. Ct. at 2204 (quoting *Spokeo*, 136 S. Ct. at 1549). "That inquiry asks whether plaintiffs have identified a close historical or common-law analogue for their asserted injury." *Id.*

The Supreme Court has applied these principles to the statutory harm asserted here: failure to "follow reasonable procedures to assure maximum possible accuracy" of the OFAC information in a plaintiff's credit file. 15 U.S.C. § 1681e(b). In *TransUnion*, the Supreme Court held that "publication to a third party of a credit report bearing a misleading OFAC alert" concretely injures the subject of the report. 141 S. Ct. at 2208. That injury bears a close relationship to "the reputational harm associated with the tort of defamation," which is a harm traditionally recognized as providing a basis for a lawsuit in American courts. *Id.* "Under longstanding American law, a person is injured when a defamatory statement that would subject him to hatred, contempt, or ridicule is published to a third party." *Id.* (internal quotation marks omitted). And labelling someone a potential terrorist,

10

drug trafficker, or serious criminal—as the erroneous OFAC alerts do—certainly qualifies. *See id.* at 2209.

Importantly, the Supreme Court emphasized that the presence of the same misleading OFAC alert "in an internal credit file" causes "no concrete harm" if "it is not disclosed to a third party." *Id.* at 2210. "Publication is 'essential to liability' in a suit for defamation." *Id.* at 2209 (quoting Restatement of Torts § 577 cmt. a (1938)). And "there is no historical or common-law analog where the mere existence of inaccurate information" amounts to concrete injury. *Id.* (internal quotation marks omitted). Accordingly, the Court held that the class members whose misleading credit reports were provided to third-party businesses suffered a concrete harm and thus had standing to pursue their FCRA reasonable-procedures claim, but the class members whose misleading internal credit files were *not* provided to third-party businesses did not suffer a concrete harm and thus did not have standing to pursue their claim. *See id.* at 2200.

Fernandez, like the district court, contends that dissemination of an inaccurate tenant screening report to a third party is always sufficient to establish a concrete injury for Article III standing, whether or not the third party read or understood the misleading accusation in the report. For this reason, Fernandez argues, evidence that Kemp did not review or consider the OFAC information in his screening report is irrelevant. We think that argument overlooks the nature of publication, which is "essential" to the reputational harm on which Fernandez relies to demonstrate a concrete injury with a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts. *Id.* at 2209 (internal quotation marks omitted).

11

"A defamatory writing is not published if it is read by no one but the one defamed"; it must be read by someone else. *Ostrowe v. Lee*, 175 N.E. 505, 505 (N.Y. 1931) (Cardozo, J.). And publication requires "not only that the defamatory matter be brought to the attention of a third person but that he understand its defamatory significance." Restatement of Torts § 577 cmt. c; *see*, *e.g.*, *id.* § 577 cmt. d ("A libel may be published in a foreign language *provided it is understood by the person to whom it is communicated*." (emphasis added)); *Ostrowe*, 175 N.E. at 505 ("Enough that a writing defamatory in content has been read and understood at the behest of the defamer."). As the Supreme Court acknowledged in *TransUnion*, the reputational harm of defamation requires "that the defendant actually 'brought an idea to the perception of another,'" which generally "require[s] evidence that the document was actually read and not merely processed." 141 S. Ct. at 2210 n.6 (quoting Restatement of Torts § 559 cmt. a).

Of course, when assessing whether a plaintiff's asserted harm has a "close relationship" to a harm traditionally recognized as providing a basis for a lawsuit in American courts, "we do not require an exact duplicate." *Id.* at 2209. But the fundamental nature of reputational harm is "'loss of credit or fame, and not the insult [itself].'" *Id.* (quoting J. Baker, An Introduction to English Legal History 474 (5th ed. 2019)); *see also* Blackstone's Commentaries, Abridged 326 (9th ed.) (Libel); Restatement of Torts § 577 cmt. b. Without a third party reading and comprehending the accusation—which is to say, without publication—there can be no reputational harm.

The Supreme Court recognized this principle in *TransUnion* when it rejected the plaintiffs' theory that TransUnion published the class members' information by disclosing

it to employees within TransUnion or to vendors who printed the mailings the class members received. *See* 141 S. Ct. at 2210 n.6. The Court insisted on "evidence" that the class members' information was "actually read and not merely processed," evidence that was "lacking" in both circumstances. *Id.* "[P]ublication," the Court explained, is "a fundamental requirement of an ordinary defamation claim," and a theory of harm that "circumvents" the publication requirement "does not bear a sufficiently 'close relationship' to the traditional defamation tort to qualify for Article III standing." *Id.*

That is not to say that a plaintiff need show any *additional* or *tangible* harm once a third party has read the misleading information and understood its defamatory significance. At common law, a person was injured when a false statement "that would subject him to hatred, contempt, or ridicule" was published to a third party. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 13 (1990) (internal quotation marks omitted). That reputational injury is sufficiently concrete to support Article III standing, even though a given cause of action may require more to state a claim. *Cf. Garey v. James S. Farrin, P.C.*, 35 F.4th 917, 922 (4th Cir. 2022) ("[O]ur inquiry 'focuse[s] on types of harms protected at common law, not the precise point at which those harms become actionable.'" (quoting *Krakauer v. Dish Network, LLC*, 925 F.3d 643, 654 (4th Cir. 2019)). As Fernandez notes, the law of defamation has traditionally distinguished between communications that are actionable per se—that is, "irrespective of whether any special harm has been caused to the plaintiff's reputation or otherwise"—and communications that create liability only if they cause the plaintiff "special harm." Restatement of Torts § 569 cmt. c; *see also id.* §§ 558, 570, 575; *cf. Spokeo*, 136 S. Ct. at 1549. The upshot for our inquiry is that unquantifiable reputational

13

harm has "traditionally" been "recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 141 S. Ct. at 2204. But even defamation per se "require[s] evidence of *publication*," without which there could be no concrete harm. *Id.* at 2211 (internal quotation marks omitted); *see* Restatement of Torts § 569 cmt. c (explaining that "publication of any libel is actionable per se" because "publication is itself [the] injury"); *id.* § 570 (stating that one who "publishes" slander per se, which attributes any of four negative traits to another, is liable to the other); *cf. Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349 (1974) ("Under the traditional rules pertaining to actions for libel, the existence of injury is presumed from the fact of publication.").

Our sister circuits agree with these principles. For example, in *Maddox v. Bank of New York Mellon Trust Co., N.A.*, the Second Circuit considered a claim that the defendant bank unlawfully delayed recording the satisfaction of the plaintiffs' mortgage. 19 F.4th 58, 59 (2d Cir. 2021). The court held that the plaintiffs had not alleged a reputational harm sufficient for Article III standing because, although the "misleading record [of their supposedly unsatisfied mortgage] may have been public and available to all" at the county clerk's office, "so far as is known, it was read by no one." *Id.* at 65. "[I]t is self-evident," the court reasoned, "that 'unless the defamatory matter is communicated to a third person there has been no loss of reputation,'" and the matter has not been "communicated" to a third person if "'it is read by no one but the defamed.'" *Id.* (first quoting Restatement of Torts § 577 cmt. b; then quoting *Albert v. Loksen*, 239 F.3d 256, 269 (2d Cir. 2001)).

Similarly, in *Ewing v. MED-1 Solutions, LLC*, the plaintiffs sued debt collectors under the Fair Debt Collection Practices Act for failing to tell a credit reporting agency that

the plaintiffs contested certain consumer debts. 24 F.4th 1146, 1149 (7th Cir. 2022). When assessing whether the plaintiffs had suffered a concrete injury, the Seventh Circuit "focus[ed] on the question of publication because an unpublished statement, even if false and defamatory, is not injurious." *Id.* at 1153. "The essential point, one that has always been necessary to prove publication," the court emphasized, "is this: the third party must understand the defamatory nature of the communication." *Id.* at 1154. Because the credit reporting agency "understood the defamatory significance" of the debt collectors' reports, the court held that the plaintiffs had suffered a sufficiently concrete reputational injury.[2] *Id.*

Fernandez counters that when false or misleading information is disseminated to a third party, we can presume the third party read or used that information. We don't doubt that inferences based in customary experience and common sense can be utilized to allege and even prove publication. For example, Fernandez cites *Brian v. Harper*, a case where an alleged defamatory article was published in a newspaper with a "large circulation." 80 So. 885, 886 (La. 1919). The court reasoned that the plaintiff "was not required, in stating his cause of action," to allege that the article "was actually read by any one" but could rely

---

[2] The parties also discuss *Hunstein v. Preferred Collection & Management Services, Inc.*, 48 F.4th 1236 (11th Cir. 2022) (en banc). In that case, a plaintiff sued a debt collection agency for violating the Fair Debt Collection Practices Act when the agency disclosed information about his debt to a mail vendor. *Id.* at 1240. Concluding that the plaintiff lacked standing, the Eleventh Circuit rejected his analogy to the common law tort of public disclosure because there was no evidence that the mail vendor "read and understood" or otherwise "perceive[d]" the plaintiff's private financial information, much less that the information was communicated "to the public at large" or was "substantially certain" to become "public knowledge." *Id.* at 1246–1247 (internal quotation marks omitted).

on "the presumption" that someone read the newspaper, including the defamatory article. *Id.* ("It is too well settled to require citation of authority that a libel committed by publication in a newspaper is accomplished when the publication goes into circulation."). Similarly, evidence that businesses "specifically requested and paid for" credit reports could support an inference that the businesses "viewed those credit reports." *Maddox*, 19 F.4th at 65. But none of these cases dispense with the publication requirement; they simply acknowledge the variety of evidence that can be relevant for proving it.

Nor did *TransUnion* rule out the possibility that, in the face of evidence to the contrary, dissemination of a consumer report may not suffice to prove that a third party perceived certain information therein. There was no doubt in *TransUnion* that a third party read and understood the misleading OFAC information included in the credit report for Ramirez, the named plaintiff. After receiving the OFAC alert, a salesman refused to sell Ramirez a car because "his name was on a 'terrorist list.'" 141 S. Ct. at 2201 (quoting the record). The parties stipulated that 1,853 class members (including Ramirez) "had their credit reports disseminated by TransUnion to potential creditors" during the relevant period. *Id.* at 2202. Although they addressed the publication requirement, neither the parties nor the Court discussed the possibility that the damaging OFAC information in any of those credit reports was not understood by the potential creditors who received them. The issue simply was not before the Court. *Cf. Webster v. Fall*, 266 U.S. 507, 511 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.").

16

As a final point of clarification, we have not addressed the risk of future harm from the misleading tenant screening reports because Fernandez and the other class members do not pursue "forward-looking, injunctive relief" but only statutory and punitive damages. *TransUnion*, 141 S. Ct. at 2210. A plaintiff must demonstrate standing for each form of relief sought. *Id.* While a substantial and imminent risk of future harm may satisfy the concreteness requirement when a plaintiff seeks injunctive relief, it does not in a suit for damages. *Id.* at 2210–2211. Thus, Fernandez must show that a third party read and understood, or otherwise considered, the misleading OFAC information in his screening report; a future risk of publication does not suffice.

B.

We now apply these principles to assess whether Fernandez, the named plaintiff, has demonstrated a concrete injury from the misleading OFAC possible match included in his tenant screening report. Fernandez appears to contend that, because Dorsey Ridge paid RentGrow for his tenant screening report, we can infer that a Dorsey Ridge representative read or utilized everything in that report. But the evidence of Dorsey Ridge's standard practice and the specific circumstances surrounding Fernandez's report do not support that inference, they contradict it.

Regarding standard practice, a number of undisputed facts are relevant. To begin, an OFAC possible match does not affect the screening result—accept, reject, or accept with conditions—in an applicant's report. We mention this fact not because a plaintiff must show that the misleading OFAC information caused him to be denied an apartment or resulted in any other harm in addition to the reputational injury of unjustly being labeled a

17

terrorist or drug trafficker. Rather, we mention this fact because even if no one at Dorsey Ridge read and understood the OFAC match information in Fernandez's report, that misleading information nevertheless could have caused him concrete harm if it negatively factored into an assessment which Dorsey Ridge considered. But that is not the case here.

Further, Kemp's testimony undermined any presumption that, because Dorsey Ridge paid for tenant screening reports, a representative would have read and understood everything in those reports, including OFAC information. To the contrary, Kemp testified that her standard practice, and that of leasing agents under her supervision, was to review only the screening result on the first page of the report if the recommendation was "accept." Even for reports with a "deny" or "accept with conditions" result that required closer scrutiny, Kemp testified that she did not know if she had ever looked at the section of a screening report about OFAC potential matches. Indeed, Kemp—the senior property manager for Dorsey Ridge—admitted she was not even "sure what OFAC is." J.A. 215.

As for Fernandez's tenant screening report in particular, no evidence suggests that anyone at Dorsey Ridge read the OFAC section at the end of the report falsely stating he might be linked to a drug trafficking organization or read and understood the defamatory significance of the "1 possible match in OFAC name search" listed on the first page of the report. Kemp recalled that Fernandez's application required further review because of criminal records in his screening report, not because of "OFAC possible match information," and that she would have "reviewed the screening to see what came back on the criminal" record information. J.A. 214–215, 344. Fernandez testified that Whatley, the leasing agent he dealt with most directly, never mentioned the OFAC list possible

18

match to him.  And of course, if Kemp did not know what OFAC was, she could not understand the defamatory significance of a "possible match in OFAC name search."  The final section of Fernandez's report gave details about the supposed match, stating that he might be linked to a "drug trafficking organization."  J.A. 97 (capitalization removed). While the defamatory import of those details would be apparent to anyone who read that section of his report, the evidence of Dorsey Ridge's standard practice and its review of Fernandez's application in particular indicates that no one did.

For these reasons, we cannot agree with the district court's speculation that perhaps "the individual(s) who reviewed Mr. Fernandez's rental application did in fact see the [OFAC] alert and simply forgot."  *Fernandez*, 341 F.R.D. at 189 n.11.  As the party invoking federal jurisdiction, Fernandez "bear[s] the burden of demonstrating that [he has] standing."  *TransUnion*, 141 S. Ct. at 2207.  And at summary judgment, a plaintiff must demonstrate standing with evidence, not mere allegations or "unsupported speculation." *Smith v. Schlage Lock Co., LLC*, 986 F.3d 482, 486 (4th Cir. 2021) (per curiam) (internal quotation marks and brackets omitted); *see also Lujan*, 504 U.S. at 561; *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015) ("To create a genuine issue for trial, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." (internal quotation marks omitted)).  According to the undisputed evidence, even though Dorsey Ridge paid for tenant screening reports, its senior property manager—who reviewed Fernandez's report—could not recall ever looking at the OFAC section of any screening report and didn't know what OFAC was.  No evidence

19

suggests that Dorsey Ridge had any policy about renting to tenants with an OFAC name match, which would have spurred Kemp and the leasing agents to review that information. After discovery in this case, an inference that Dorsey Ridge representatives read and understood the OFAC information in Fernandez's tenant screening report they requested from RentGrow has proven to be unsupported.

Accordingly, Fernandez has failed to demonstrate that the misleading OFAC information in his screening report was read and understood, or otherwise considered, by any third party, as would support the kind of "reputational harm associated with the tort of defamation." *TransUnion*, 141 S. Ct. at 2208. Because reputational harm is the only injury Fernandez asserts in relation to his claim that RentGrow failed to follow reasonable procedures to assure the accuracy of OFAC information in his screening report, he has not shown a concrete injury in fact flowing from that alleged statutory violation. And without a concrete injury, Fernandez lacks Article III standing to bring this claim. *See TransUnion*, 141 S. Ct. at 2200 ("No concrete harm, no standing.").

## C.

The foregoing analysis inevitably affects the district court's class certification order. "To obtain certification of a class action for money damages under Rule 23(b)(3), a plaintiff must satisfy Rule 23(a)'s . . . prerequisites of numerosity, commonality, typicality, and adequacy of representation, and must also establish that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,

568 U.S. 455, 460 (2013) (internal citation and quotation marks omitted).  In the district court, RentGrow argued that the inquiry necessary to determine whether each class member had suffered a concrete injury sufficient for Article III standing undermined nearly every Rule 23 prerequisite.  The district court categorically rejected RentGrow's arguments in view of its ruling that dissemination of the class members' tenant screening reports, by itself, established a concrete injury to Fernandez and each class member, regardless of whether a third party read and understood, or otherwise considered, the misleading OFAC alerts in those reports.

We have concluded that the district court's standing analysis was erroneous and that Fernandez lacks standing to pursue the OFAC claim.  Because that ruling undermines the district court's reasoning at various points throughout the class certification order, we think that court is best positioned to reconsider class certification in the first instance in light of this opinion.

## III.

The district court's order granting class certification is vacated and remanded for further proceedings consistent with this opinion.

*VACATED AND REMANDED*

NIEMEYER, Circuit Judge, concurring:

The factual profile in this case — dissemination of an erroneous Office of Foreign Assets Control (OFAC) report — is nearly identical in kind to that in *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), where the Supreme Court held that individuals who have had false information about them "*disseminated* to third parties suffer[] a concrete injury in fact under Article III" and therefore have standing to sue. *Id*. at 433 (emphasis added). But the one subtle difference, which by its nature is material, is that in *TransUnion*, the Supreme Court was presented with an *unchallenged* record where the disseminated OFAC report was indeed read by third parties, thus inflicting injury on the plaintiff. The plaintiff there was denied the opportunity to purchase an automobile from an automobile dealer because "his name was on a terrorist list." *Id*. at 420 (cleaned up). In this case, however, as Judge Rushing has carefully pointed out, such a conclusion that third parties read the erroneous OFAC report cannot be made based on the record before us, and therefore the injury shown in *TransUnion* has not been shown in this case.

While this is indeed a close call — as in other similar circumstances, a third-party reading of the false information might be presumed — I am satisfied that Judge Rushing has conducted a thorough analysis of the record before us to show that such a third-party reading cannot be presumed. Therefore, I am pleased to join her opinion in full.